# 2000 DTA 158

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL I DE SAN JUAN
PANEL III**

JUAN ANTONIO GARCIA, COMO COMISIONADO DE SEGUROS DE PUERTO RICO
Peticionario-Apelado

v.

EL FENIX DE PUERTO RICO, COMPAÑIA DE SEGUROS
Demandado

v.

ORIENTAL BANK TRUST, ET AL.
Demandado

FIRST BANK DE PUERTO RICO; Y SU ASEGURADORA
DE NOMBRE DESCONOCIDO
Demandados-Apelantes

FIRST BANK DE PUERTO RICO
Demandado, Demandante contra Coparte

v.

## ORIENTAL BANK & TRUST
Codemandado-Demandado de Coparte

v.

## FIRST BANK
Demandado, Demandante Contra Tercero

v.

## GRUPO ASEGURADOR EL FENIX, LTD.
Tercero Demandado

Núm. KLAN-2000-00054

Panel integrado por su Presidente, el Juez Arbona Lago
y los Jueces Brau Ramírez y Urgell Cuebas

San Juan, Puerto Rico, a 20 de junio de 2000

*Per Curiam*

## TEXTO COMPLETO DE LA SENTENCIA

El FirstBank de Puerto Rico (First Bank) y Grupo Asegurador Fénix, L.T.D. (Grupo Asegurador) otorgaron un contrato de préstamo el 31 de agosto de 1994 por la suma de $2,800,000.00. En dicha misma fecha. El Fénix de Puerto Rico (El Fénix), que es una subsidiaria de Grupo Asegurador, suscribió a favor de FirstBank documentos de garantía con el propósito de asegurar al FirstBank el repago del préstamo, conforme a los términos contractuales. En particular, el Fénix suscribió a favor de FirstBank un *"Guarantee Bond"* por la cantidad de $300,000.00, mediante afidávit autorizado el 31 de agosto de 1993 por un representante de Grupo

Asegurador y El Fénix, ante el notario Don Ernesto A. Meléndez Pérez.

Alegadamente, para garantizar su deuda y la de Grupo Asegurador, el Fénix se obligó y también mantuvo como garantía *("colateral")* en efectivo y en certificados de depósito no negociables con el FirstBank, en montos equivalentes al préstamo de FirstBank para con Grupo Asegurador. Tal garantía en efectivo se colocó por FirstBank en inversión que producía ingreso (intereses) para El Fénix en instrumentos no negociables que, a su vez, podían ser liberados según se reducía el préstamo de Grupo Asegurador en FirstBank.

Casi tres años y medio, luego de tomado el préstamo bancario, en enero de 1997, el Fénix solicitó al FirstBank que se le autorizare utilizar la colateral en efectivo antes referida y entonces reducida a $1,300,000.00 (ya se había repagado $500,000.00 por Grupo Asegurador al Banco), con el fin específico de permitir a El Fénix mayor grado de liquidez para afrontar de inmediato una situación de emergencia que suscitó el paso del Huracán Hortense por Puerto Rico. El Fénix indicó que se trataba de una situación apremiante y de muy corto plazo, la que se normalizaría prontamente con el reembolso de las aportaciones provenientes de las reaseguradoras, en relación con tales pagos de reclamaciones. El FirstBank asintió bajo el acuerdo de que tales abonos de los reaseguradores se constituian en garantías adicionales del préstamo. A tal efecto, El Fénix envió la siguiente carta el 14 de enero de 1997 al FirstBank:

*"Sra. Milagros Durán, Vicepresidente*
*Préstamos Comerciales*
*FirstBank*
*Santurce, PR*

*Estimada Milagros:*

*Sirva la presente para confirmar nuestra conversación telefónica en la cual te indiqué la necesidad de utilizar los fondos que en estos momentos tenemos depositados con el FirstBank en inversiones a corto plazo, de nuestra compañía El Fénix de Puerto Rico. Tal y como les indicara, tanto a tí como al Sr. Angel Alvarez, en estos momentos nos encontramos liquidando gran parte de las pérdidas ocasionadas por el huracán "Hortense". Esto hace que las liquidaciones de los recobros de pérdidas a nuestros reaseguradores sean tramitadas para finales de diciembre y enero de 1997, por lo que la necesidad de efectivo en nuestra compañía se hace necesaria.*

*Según te explicara, con los recobros que esperamos recibir de nuestros reaseguradores en los próximos días, habremos de restituir inmediatamente toda inversión a corto plazo o antes del lunes, 3 de febrero de 1997.*

*Sin otro particular a que referirme, como siempre, nos reiteramos a tus órdenes para cualquier información adicional sobre el particular.*

*Atentamente,*

*William Noel Tirado, Presidente*

*/lgmo*

*c: Sr. Luis M. Beauchamp*
*Vicepresidente Ejecutivo"*

Mientras ello ocurría, el préstamo de FirstBank a Grupo Asegurador, también garantizado ahora por El Fénix con el repago de las reaseguradoras respecto a pagos de seguros debido al Huracán Hortense, continuaba reduciéndose al extremo que para junio de 1997 estaba en $800,000.00 (se habían ya pagado $2,000,000.00 de

los $2,800,000.00 originales). En vista de ello, FirstBank y El Fénix supuestamente acordaron que la aseguradora sólo depositaría con el Banco 8 certificados de depósito no negociables *("nontransferable")* de $1,000,000.00 cada uno, remodificando a su vez la garantía constituida en el repago de reaseguradoras por la original colateral líquida.

Tal era la situación bancaria comercial entre El Fénix y FirstBank cuando El Fénix fue declarado insolvente el 29 de agosto de 1997 e intervenido el 16 de septiembre de 1997 por el Comisionado de Seguros de Puerto Rico (el Comisionado), para iniciar su liquidación.

Ocurrida la *"... merma, disminución o menoscabo"* en la capacidad económica del garantizador solidario El Fénix, el FirstBank cobró de la garantía en efectivo prestada por El Fénix el balance deudor del préstamo otorgado a Grupo Asegurador, conforme al pre-existente acuerdo de garantía líquida. De tal forma, FirstBank realizó los 8 certificados de depósito (CD) no negociables (Exhibit IV, pág. 92 apéndice de apelación) y éstos cesaron de devengar intereses.

Es contra tales dineros que el Comisionado reclama judicialmente en la causa KAC-97-0946. Señala que los CD le pertenecen en calidad de liquidador de El Fénix y que FirstBank retiene $800,000.00 sin derecho a ello, porque no pertenecen a El Fénix, en tanto y en cuanto eran parte de un fideicomiso al amparo del Capítulo 25 del Código de Seguros para reserva ante reclamaciones de pólizas de seguros de catástrofe. Aduce que tal compensación constituye una preferencia anulable conforme al Art. 40.250(1) (b) del Código de Seguros de Puerto Rico, 26 L.P.R.A. S4025(1)(b).

Por su parte, FirstBank contestó la demanda el 3 de septiembre de 1998 y alegó que al momento de expedirse los certificados de depósito (CD) no negociables, el dinero pertenecía a FirstBank y que luego fueron objeto de compensación, conforme al contrato de garantía pre-existente desde el 1993. También reconvino y presentó demanda de coparte contra Oriental Bank & Trust, asunto que no está aquí relacionado en la parte del litigio que no corresponde ahora atender.

El 13 de agosto de 1999, el Comisionado presentó un escrito titulado *"Moción Solicitando se Dicte Sentencia Sumaria Parcial en Contra de FirstBank de Puerto Rico y Solicitando la Desestimación de la Reconvención"*. FirstBank presentó su oposición el 19 de octubre de 1999. El 22 de noviembre, notificado el 15 de diciembre de 1999, el ilustrado foro de Primera Instancia dictó Sentencia Sumaria Parcial en la que ordenó a FirstBank entregar al Comisionado los $800,000.00, 9.50% de interés anual computado a partir del 16 de septiembre de 1998 (fecha en que el Comisionado intervino a la aseguradora El Fénix), y la suma de $3,000 en calidad de honorarios de abogado.

De tal dictamen, recurre FirstBank e imputa al hermano foro de Primera Instancia la comisión de los siguientes dos errores:

*"A. ERRO EL TRIBUNAL DE PRIMERA INSTANCIA AL CONCLUIR QUE LA COMPENSACION QUE EFECTUO EL FIRSTBANK CON LOS FONDOS QUE TENIA DEPOSITADOS EL FENIX EN CERTIFICADOS DE DEPOSITO ADQUIRIDOS EL 27 DE JUNIO DE 1997 CONSTITUYE UNA PREFERENCIA ANULABLE BAJO EL ARTICULO 40.250 DEL CODIGO DE SEGUROS.*

*B. ERRO EL TRIBUNAL DE PRIMERA INSTANCIA AL CONCLUIR QUE EL FIRSTBANK ACTUO TEMERARIAMENTE AL DEFENDERSE DE LA ACCION PRESENTADA EN SU CONTRA POR EL COMISIONADO DE SEGUROS Y AL FIJAR LA TASA DE INTERES EN VIOLACION A LO DISPUESTO EN LA REGLA 44.3 DE PROCEDIMIENTO CIVIL."*

El Comisionado ha comparecido mediante su Alegato en Oposición y Recurso de Apelación y estamos en posición de resolver.

**Exposición y Análisis**

**I**

El hermano foro de Primera Instancia entendió *"... que la controversia existente surge como resultado de la interpretación que cada parte le da al Art. 40.250(1) (a) y (b) del Código de Seguros de Puerto Rico, 26 L.P.R. A. §4025 (1) (a) y (b)..."*, que a continuación transcribimos, por lo que procedió a resolver mediante sentencia sumaria parcial dicho aspecto de derecho.

*"§4025. - Preferencias y gravámenes anulables*

*(1) (a) Una preferencia es la transferencia de una propiedad de un asegurador a, o para beneficio de un acreedor, por o a cuenta de una deuda antecedente consumada o aceptada por el asegurador dentro de un año antes de la radicación de una petición exitosa de liquidación con arreglo a este Capítulo cuyo efecto puede ser permitir al acreedor obtener un porcentaje mayor de esta deuda que el que hubiera recibido otro acreedor de la misma clase. Si se radica una orden de liquidación mientras el asegurador está ya sujeto a una orden de rehabilitación, entonces estas transferencias se considerarán preferencias si se consumaron o aceptaron dentro de un año antes de la radicación de la petición exitosa de rehabilitación o dentro de los dos (2) años con anterioridad a la radicación de la petición exitosa para liquidación, de estos dos (2) períodos, el menor.*

*(b) El liquidador podrá anular una preferencia si:*

*(1) El asegurador estaba insolvente al momento de la transferencia.*

*(2) la transferencia se efectuó dentro cuatro (4) meses antes de la radicación de la petición, o*

*(3) el acreedor que la recibió o que habría de beneficiarse de la misma o su agente en la transacción, tenían, al momento de efectuarse la transacción, suficiente razón para creer que el asegurador estaba insolvente o estaba a punto de quedar insolvente, o*

*(4) el acreedor que la recibió era un funcionario, empleado o abogado u otra persona que de hecho estaba en una posición de influencia en el asegurador comparable a la de un funcionario, independientemente que ocupara o no tal posición, o un accionista que tuviera directa o indirectamente más de cinco (5) por ciento de cualquier clase de acciones emitidas por el asegurador o cualquier otra persona, firma, corporación, sociedad o conjunto de personas con quienes el asegurador trataba a distancia."*

A tal respecto, resolvió que el FirstBank efectuó la compensación impugnada por el liquidador entre el 27 de junio y el 27 de septiembre de 1997, porque esa era la vigencia de los 8 certificados de depósito no negociables que mantenía el FirstBank en garantía (pág. 13 de la sentencia apelada, pág. 14 del apéndice de apelación).

También resolvió que, al así actuar, el FirstBank efectuó una transferencia preferencial de fondos de El Fénix, dentro del término de cuatro meses antecedentes al decreto de insolvencia de dicha aseguradora, según la orden judicial del 16 de septiembre de 1997 en la causa KAC-97-0946-102 (906).

Para arribar a dicha conclusión, el ilustrado foro de Primera Instancia entendió que el término *"deuda antecedente, utilizad[o] en el Artículo 40.250(1)(a) del Código de Seguros, se refiere a todas las deudas del asegurador, incluyendo las contraídas con anterioridad al año antes de la radicación de una petición exitosa de liquidación."* (Pág. 12 de la sentencia apelada, pág. 13 del apéndice de apelación). Por tanto, una vez Instancia concluyó que dentro del Art. 40.250(1)(a), el requisito de *"consumado o aceptado"* se refiere a la transferencia de propiedad del asegurador y no a la deuda del asegurado y, por tanto, se trataba de una preferencia, consideró que el Comisionado de Seguros actuó correctamente al amparo del Art. 40.250(1)(b) cuando reclamó los $800,000.00 del FirstBank, porque tal preferencia se verificó dentro del término de cuatro

meses a partir de la *"radicación de la petición de intervención judicial"*, lo que ocurrió el 16 de septiembre de 1997.

## II

FirstBank plantea que el Tribunal de Primera Instancia erró al concluir que en el Art. 40.250 (1) (a) del Código de Seguros, *supra*, el requisito de *"consumado o aceptado"* se refiere a la fecha en que ocurre la transferencia de propiedad del asegurador a su acreedor en pago de deuda preexistente, (como alega el Comisionado) y que, por tanto, estamos ante un pago preferente.

La posición de FirstBank es que *"consumado o aceptado"* hace referencia a la fecha en que se contrae la deuda y, por lo tanto, no estamos ante un pago preferente, ya que el precepto requiere que la consumación o aceptación se produzca *"dentro de un año antes de la radicación de una petición exitosa de liquidación"* y que la deuda cuyo cobro se perseguía se originó en 1993.

Consideramos correcta, sin embargo, la interpretación del Tribunal de Primera Instancia. Aunque, ciertamente, la lectura repetida de la primera oración del Art. 40.250(1) (a), *supra*, favorece la apreciación de FirstBank, la relectura de su segunda oración se inclina a la posición del Comisionado de Seguros. Dicha oración indica que *"estas transferencias se considerarán preferencias si se consumaron o aceptaron dentro de un año antes de la radicación de la petición exitosa de rehabilitación o dentro de los dos (2) años con anterioridad a la radicación de la petición exitosa para liquidación, de estos dos (2) períodos, el menor."* Claramente, la *"consumación"* o *"aceptación"* a la que se hace referencia en esta segunda oración es a la del pago y no de la deuda.

Es norma de sabia hermenéutica la que requiere interpretar globalmente la ley para evitar que factores semánticos desvirtúen su propósito. *Pueblo v. Sucn. Junghanms*, 73 D.P.R. 648 (1952); *Central Coloso v. Descartes*, 74 D.P.R. 481 (1953); *Avon v. Sec. del Trabajo*, 105 D.P.R. 803 (1977); *Hull Dobbs v. Tribunal*, 82 D.P.R. 77 (1961). En ocasiones, particularmente cuando se trata de traducciones, divergencias en redacción presentan diferencias de puro espejismo y tan pronto se indaga un poco sobre el propósito y utilidad del estatuto, se advierte que verdaderamente no existe una real diferencia de conceptos.

A tal respecto, en *Silva v. Panel*, **95 J.T.S. 8,** se dijo:

*"No podemos olvidar que una ley debe ser siempre interpretada tomando en consideración los fines que persigue y en forma tal que la interpretación se ajuste al fundamento racional o fin esencial de ley y la política pública que la inspira. Ind. Cortinera v. PRTC, 93 J.T.S. 15, Esso v. APPR, 95 D.P.R. 772, 785 (1963)."*

Y en *González v. E.L.A.*, **95 J.T.S. 52**, se reiteró:

*"Dicha conclusión es cónsona con el principio cardinal de hermenéutica legal que al interpretar una ley, deberá siempre atribuirsele el sentido que mejor responda a la realización del resultado que persigue. Torres v. Castillo Alicea, 111 D.P.R. 792, 801 (1981); García Commercial Inc. v. Sec. de Hacienda, 80 D.P.R. 765, 774 (1958). Debe adoptarse una interpretación sensata, lógica y razonable de la ley, de suerte que se haga valer la intención del legislador. Gobernador de P.R. v. Alcalde de Coamo, Op. de 21 de septiembre de 1992, 92 J.T.S. 125, pág. 995. De igual manera, en buena metodología interpretativa, la ley debe tomarse como un ente armónico y consistente; interpretarse sus diferentes secciones, las unas en relación con las otras, supliendo la deficiencia en una con lo dispuesto en la otra, pero siempre orientado a dar cumplimiento al propósito legislativo. Zambrana v. E.L.A., Op. de 30 de enero de 1992, 92 J.T.S. 12, pág. 9171; Bernier y Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, 2da ed. rev. San Juan, Publicaciones J.T.S. 1987, pág. 315."*

Recientemente, en *Pueblo v. Barreto Rohena*, **99 J.T.S. 172,** pág. 371, se dijo:

*"Es apropiado, aquí, hacer un breve paréntesis para recordar algunas normas de hermenéutica. Recientemente, este Tribunal reiteró que todas las leyes, incluyendo las más claras, requieren de algún grado de interpretación. Pueblo v. Sierra Rodríguez, res. el 8 de febrero de 1995, 95 J.T.S. 11. Por supuesto, hay que recordar que "al lenguaje de una ley debe dársele la interpretación que valide el propósito del legislador, conscientes siempre de sus consecuencias." Pueblo v. Ríos Dávila, res. 30 de junio de 1997, 143 D.P.R. ___ (1997), 97 J.T.S. 108; Pacheco v. Vargas, Alcaide, 120 D.P.R. 404, 409 (1988). Por ello, nuestra obligación es viabilizar que el derecho sirva un fin útil y tratar de evitar aquella interpretación tan literal que lleve a resultados absurdos.*

*Tratándose de términos que ocurren dentro de un mismo estatuto, opinamos que los mismos deben ser interpretados de manera uniforme, por lo que nos parece correcta la interpretación del Tribunal de Primera Instancia de que la transacción en cuestión podría estar cubierta por el precepto, ya que la misma ocurrió dentro del año anterior a la petición de liquidación de El Fénix."*

No obstante, lo anterior no resuelve la controversia que esta causa presenta, la que alegadamente está relacionada al repago de una deuda garantizada.

### III

Al considerar el propósito de la ley o véase *Torres v. Castillo Alicea, supra*, pág. 801 --encontramos que más adelante, en el texto del propio Art. 40.250(1)(a)-- precisamente al final de su primera oración, se dice que preferencia necesariamente implica un pago *"...cuyo efecto puede ser permitir al acreedor obtener un porcentaje mayor de esta deuda que el que hubiera recibido otro acreedor de la misma clase"*.

Por tanto, entendemos y resolvemos que cuando se trata de créditos cuyo repago está garantizado en forma mobiliaria o inmobiliariamente desde su origen, independientemente de la fecha en que el repago se verifique, no se constituye una preferencia dentro del significado del estatuto que nos ocupa, mientras la clase de acreedores protegidos con la misma garantía obtenga en repago igual porcentaje, cuando la garantía no de para el repago total. En otras palabras, no pueden equipararse acreedores asegurados y acreedores no asegurados para anular un pago hecho a los primeros mediante un bien previamente dado en garantía, ya que éstos no son acreedores *"de la misma clase"* dentro del contexto del Art. 40.250 (1) (a).

Ello es así, siempre y cuando el pago-y-cobro se verifique dentro de la protección específica del contrato de garantía y tal afianzamiento no se le haya concedido por el deudor al acreedor con posterioridad al establecimiento de la relación deudor-acreedor y dentro del año de la fecha de intervención del asegurador, con el propósito de proteger con garantía una deuda pre-existente no garantizada, cuando al momento de efectuarse esta transacción garantizadora se tenía suficiente razón para creer que el asegurador estaba insolvente o estaba a punto de quedar insolvente. Véase Art. 40.250 (1) (b) (3).

También se considera transferencia preferente cuando un acreedor de deuda pre-existente, no asegurada en su origen, luego se le protege con garantía dentro del año señalado y el acreedor resulta ser *" ... un funcionario, empleado o abogado u otra persona que de hecho estaba en posición de influencia en el asegurador comparable a la de un funcionario, independientemente que ocupara o no tal posición, o un accionista que tuviera directa o indirectamente más de cinco (5) porciento de cualquier clase de acciones emitidas por el asegurador o cualquier otra persona, firma, corporación, sociedad o conjunto de personas con quien el asegurador trataba a distancia".* Ver Art. 40.250(1)(b)(4).

### IV

En el presente caso, existe controversia real sustancial entre las partes en torno a si la acreencia del FirstBank era una asegurada mediante el colateral de los ocho (8) certificados de depósito. El FirstBank sometió evidencia documental sugiriendo que tal era el caso, por lo que el Tribunal de Primera Instancia venía primero obligado a dilucidar este punto, antes de emitir una sentencia sumaria a favor del Comisionado.

Es necesario, como premisa resolutoria, señalar brevemente que tratándose de entes subsidiarios Grupo Asegurador y El Fénix, la transacción tripartita aquí relacionada no implicaría grado alguno de ilegalidad. Como se sabe, transacciones entre corporaciones que comparten directores y oficiales son enteramente válidas, legales y obligatorias entre los entes contratantes, como cualquier otra transacción. Aún más, tales negocios jurídicos no se presumen capaces de crear conflicto de intereses cuando no se establece que haya mediado mala fe y la operación fue aprobada debidamente por los gobiernos corporativos y también resulta justa y razonable. Véase 3 Fletcher *Cyclopedia of Private Corp.*, §961, 964, 979, 12B Fletcher § 5849.

Como queda ya dicho, FirstBank ha alegado que la deuda de El Fénix se origina por vía de la obligación solidaria, que data del 31 de agosto de 1993. En tal fecha, FirstBank prestó a Grupo Asegurador Fénix, Ltd. la suma original de $2,800,000.00 con una obligación de El Fénix en forma de *"Guarantee Bond"*. Aunque de los documentos sometidos no está claro en qué momento El Fénix se obligó por la totalidad de los $2,800,000.00 prestados por el Banco a Grupo Asegurador, ni si los certificados de depósito o los fondos que éstos substituian habían sido efectivamente pignorados para responder por dicha obligación, FirstBank así lo ha alegado. La carta citada de El Fénix, del 14 de enero de 1997, sugiere que dicha parte no tenía la libre disposición de los fondos depositados con el FirstBank. ■ No parece existir controversia, por otro lado, que los certificados fueron adquiridos para substituir los fondos que habían sido retirados por El Fénix para pagar las pérdidas ocasionadas por el Huracán Hortense.

Se trata de un claro hilo conductor que se remontaría al 31 de agosto de 1993. En la fase más cercana de tal relación de acreedor-deudor, solidario, partiendo de la información que brinda la citada carta de El Fénix del 14 de enero de 1999, El Fénix supuestamente había entregado al FirstBank una garantía en forma de *" ... inversión a corto plazo..."*. No obstante, de autos no consta identificada en qué constituia dicha inversión a corto plazo ni cuáles eran las condiciones de tal garantía que a su vez impedía a El Fénix el libre uso de tales valores.

Si la transacción ocurrió como alega el Banco, no estaría en litigio que el aumento en liquidez benefició al interés público, cuando significó que El Fénix acelerase el pago de reclamaciones. Lo que también aceleró el cobro del reaseguro, que a su vez concluyó el círculo con la entrega al FirstBank de los certificados de depósito por $800,000.00 no negociables. Ello no albergaría beneficio impropio alguno para FirstBank, ni posible daño a los asegurados damnificados, a los que precisa y realmente la operación benefició. Tampoco puede ahí detectarse ventaja alguna para el Banco o efecto negativo que implique merma en la situación económica real de El Fénix, sus asegurados y demás acreedores no asegurados, *vis-a-vis*, la situación real de éstos en ausencia del auxilio en liquidez que FirstBank concedió a El Fénix, con motivo de la variante temporera y momentánea en la garantía.

Visto este asunto desde la perspectiva pragmática, se ha reiterado que:

*"... el procedimiento del Capítulo 40 del Código de Seguros es un mecanismo especial dirigido a proteger de la mejor manera posible los intereses de los asegurados, reclamantes y acreedores de cualquier compañía aseguradora cuya débil condición financiera la pone en peligro de no poder atender todas sus obligaciones cabalmente." Ruiz García v. New York Department Stores*, **98 J.T.S. 98,** pág. 1375.

Como queda ya señalado, en la medida en que la modificación de la garantía, pre-existente desde el 1993, sólo hubiera servido para beneficiar *"... los intereses de los asegurados, reclamantes y acreedores de..."* El Fénix, porque sirvió para aumentar su liquidez en momentos apremiantes para cualquier aseguradora, estaríamos de acuerdo con el Banco en que no se puede señalar que violentó el mencionado principio rector del Capítulo 40 del Código de Seguros.

Si tales dineros se utilizaron con tal propósito, lo que está en controversia y aún no se ha acreditado de forma suficiente, no es posible que la reestructuración de la garantía pre-existente (mutando de cesión de reclamación contra reaseguro de reclamaciones, pagadas con tales dineros, a certificados de depósito) se pueda

considerar como perjudicial al grupo que el Capítulo 40 del Código de Seguros, *supra*, protege y que originalmente fue bien servido con tal operación de banca.

En pocas palabras, El Fénix, ahora sus acreedores representados por el Comisionado, no podrían pretender quedarse con los pagos recibidos de sus reclamaciones cubiertas con la liquidez que FirstBank facilitó y luego también quedarse con la devolución del reaseguro que tales partidas causaron y con las que se adquirieron los CD que se entregaron al banco, conforme a lo pactado respecto a la preexistente garantía.

Por el contrario, la posición del Comisionado implicaría arribar a situaciones que podrían llevarnos a la inequidad, al convertir una deuda garantizada ---a la cual FirstBank no hubiera incurrido de otro modo como consta de los documentos en garantía--- en una deuda no asegurada de *"... clase cuatro (4) en el orden de prioridad de pago establecido en el Art 40.390 del Código de Seguros, 26 L.P.R.A. § 4039".*

Se ha hecho énfasis en esta jurisdicción en que con respecto al Artículo 40.250 del Código de Seguros, *supra, "La preferencia tiene que ser una transferencia cuyo efecto sea permitir al acreedor obtener un porcentaje mayor de la deuda que hubiera recibido otro acreedor de la misma clase". García v. Lebrón Román,* **95 J.T.S. 68,** pág. 913.

En caso de que la garantía prestada por El Fénix pueda considerarse como garantía preferente, en forma y con valores específicos, como también ocurre con la hipoteca inmobiliaria (30 L.P.R.A. §2551) y sus múltiples variantes respecto a bienes muebles, parecida o similar a la refracción, véase *Rexach Concrete Corp. v. Jardines M. Olivo,* 108 D.P.R. 551 (1979), al amparo del Capítulo 40.250 (1) (a) del Código de Seguros no puede ocurrir una *"preferencia"* cuando la garantía favorece a un sólo acreedor que no compite con ningún otro acreedor, respecto a una misma garantía; en este caso, los ocho CD por un total de $800,000.00.

Como se sabe, el Art. 40.250 del Código de Seguros, *supra,* está fundado en el ordenamiento del Código de Quiebras Federal. Véase Informe Conjunto de la Cámara de Representantes, 5ta Sesión Ordinaria, mayo 1991, a la pág. 44, *García v. Lebrón Román,* **95 J.T.S. 68**, pág. 914, nota al calce núm. 4.

Es aquí de rigor señalar que el Código de Quiebras Federal separa a los acreedores garantizados de los acreedores no garantizados. Véase 11 U.S.C. 506 *("Determination of Secure Status").* Los garantizados tienen derecho al repago hasta donde alcance la garantía, las que se tomarán del derecho sustantivo local.

Avalada la certeza de tal garantía, nada más lejos estaría ello del texto, propósito y espíritu de la ley que interpretamos y del ideal de la buena fe que es exigencia general y principio rector en nuestro derecho. *H.U.C. E. de Ame. v. V & E Eng. Const,* 115 D.P.R. 711, 716 (1984); *Ramírez v. Club Cala,* 123 D.P.R. 339, 346 (1989); *Catalytic Ind. v. F.S.E.P,* 121 D.P.R. 98, 113 (1988).

En esta jurisdicción, se ha enfatizado que la buena fe es *"fuente de creación de especiales deberes de conducta exigibles en cada caso, de acuerdo con la naturaleza de la relación jurídica y con la finalidad perseguida por las partes a través de ella".* M. Godreau Robles, *Lealtad y Buena Fe Contractual,* 58 Rev. Jur. U.P.R. 367, 379 (1989), (citando a Diez Picazo, Prólogo en Wieacker, *El Principio General de la Buena Fe,* 19, Madrid, Civitas (1982). *Arthur Young & Company v. Virgilio Vega,* **94 J.T.S. 75,** págs. 11962, 11968. También se ha dicho que es preámbulo a toda actuación legal por ser exigencia general de nuestro derecho, razón por la cual no se favorecen interpretaciones que conduzcan a resultados contrarios a la buena fe. *Velilla v. Pueblo Supermarkets,* 111 D.P.R. 585, 587-588 (1981).

El ilustrado foro de Primera Instancia dictaminó en forma sumaria, sin antes resolver en forma definitiva, si realmente FirstBank cuenta con un derecho de garantía preferente, específicamente sobre las *"inversiones de corto plazo"* (Exhibit III, pág. 89, apéndice de apelación) en adelante, las que luego finalmente se convierten en los ocho CD no negociables. Al así actuar, consideró a FirstBank como acreedor común.

Se trata de un aspecto conjunto de hecho y derecho que debe ser primero dilucidado ante Instancia.

Desde un inicio, las partes también acordaron conceder al acreedor el derecho a compensación (Art. 1149, 31 L.P.R.A. §3221) como medida adicional de garantía contractual específica sobre bienes muebles particulares y *erga omnes,* sobre los fondos que El Fénix tuviese depositados en FirstBank. El Firstbank plantea que dicho derecho constituia una garantía sobre dichos bienes, lo que fue rechazado por el Tribunal de Primera Instancia.

No entendemos que, como cuestión de derecho, la facultad del Banco de ejercitar la compensación *("set-off")* de su acreencia contra los certificados depositados por El Fénix con dicha institución constituya una garantía específica sobre dichos bienes, en ausencia de un pacto específico para que dichos certificados o los fondos que ellos substituian fungieran como colateral de la deuda de El Fénix, en forma de garantía contractual bancaria similar o parecida a la refracción; véase *Rexach Concrete Corp. v. Jardines M. Olivo.* Se trata, según hemos visto, de un asunto sobre el cual existe controversia real sustancial entre las partes y que deberá ser dilucidado por el Tribunal de Primera Instancia.

**Dictamen**

Conforme a lo señalado, se revoca la Sentencia Sumaria Parcial apelada. El Tribunal de Instancia no podía arribar a la conclusión, como en efecto lo hizo, de que el pago efectuado por El Fénix al FirstBank resultó ser preferente, conforme al Art. 40.250 (1) (a) del Código de Seguros, *supra,* y anulable según lo indica el Art. 40.250 (1) (b) (1) del Código de Seguros, *supra.*

Es menester primero dilucidar ante el foro de Instancia en torno a la naturaleza de la relación del acreedor-deudor entre el FirstBank y El Fénix, respecto a los fondos de las *"inversiones a corto plazo"* que a mediados del mes de enero de 1997 el FirstBank autorizó a El Fénix a utilizar para acelerar la liquidación de las reclamaciones producidas por el Huracán Hortense.

Una vez la presente advenga final y firme y revierta el mandato al foro de Instancia, continuará el trámite conforme aquí resuelto y señalado.

Lo acordó y manda el Tribunal y lo certifica la señora Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General